## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DANA HEPWORTH, Derivatively on behalf of Nominal Defendant CELSIUS HOLDINGS, INC., | X : : | Case No. _____ |
| | : : | JURY TRIAL DEMANDED |
| Plaintiff, | : : | |
| v. | : : | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| JOHN FIELDLY, NICHOLAS CASTALDO, CAROLINE LEVY, HAL KRAVITZ, ALEXANDRE RUBERTI, CHERYL MILLER, DAMON DESANTIS, JOYCE RUSSELL, JAMES LEE, and EDWIN NEGRON-CARBALLO, | : : : : : : : | |
| Defendants, | : : | |
| and | : : | |
| CELSIUS HOLDINGS, INC., | : : | |
| Nominal Defendant. | X | |

Plaintiff Dana Hepworth ("Plaintiff"), by and through her undersigned attorneys, alleges the following upon personal knowledge as to the allegations concerning herself, and upon information and belief as to all other allegations, based, among other things, upon the investigation conducted by her attorneys, which includes a review of filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, and other publicly available sources, as well as filings from various proceedings. Plaintiff believes that after a reasonable opportunity for discovery is afforded, substantial added evidentiary support will exist for the allegations set forth herein.

## NATURE OF ACTION

1.      This shareholder derivative action is brought on behalf of nominal defendant

Celsius Holdings, Inc. ("Celsius" or the "Company"), against members of the Company's Board of Directors (the "Board") and certain Company executives for breach of their fiduciary duties from at least August 12, 2021 through March 1, 2022 (the "Relevant Period").

2.      Celsius is a company in the functional energy drink and liquid supplement categories in the United States and internationally. The Company's core offerings include pre- and post-workout energy drinks. The Company's flagship asset, CELSIUS®, is an energy drink which purportedly accelerates metabolism and burns calories and body fat while providing energy.

3.      The Company has reported massive revenue growth in recent years, growing by 43%, 74%, and 140% in the years 2019, 2020, and 2021, respectively. In 2021, the Company reported revenue growing from $50 million in the first quarter, to $65 million in the second quarter, and $94.9 million in the third quarter, which resulted in attention from investors and analysts and an increase in stock price.

4.      Celsius' profits, however, failed to grow in step. Despite the massive revenue growth – nearly doubling from $28.1 million in the first quarter 2020 to $50 million in the first quarter 2021, then nearly doubling again to $94.9 million in the third quarter – the Company's profits, as measured by net income and net income per share, remained relatively stagnant. For instance, net income grew to just $585,424 in the first quarter of 2021 compared to $546,051 in the first quarter of 2020. Investors and analysts paid close attention to net income metrics to ensure that the Company's expansion did not come at such a high cost that the Company became unprofitable.

5.      Under pressure to increase its profitability, Celsius turned to accounting fraud. Specifically, throughout 2021, Celsius dramatically understated its expenses related to share-based compensation and also improperly accounted for former employees' and directors' share-based

compensation in order to report inflated net income and net income per share.

6.      Since 2007, the Company has compensated its employees with share-based compensation, such as stock options and restricted stock units, on top of their annual salaries. These share-based compensation payments are accounted for by the Company in accordance with Accounting Standards Codification Topic 718 Compensation – Stock Compensation ("ASC Topic 718"), a standard accounting practice which measures share-based payments "on the date of grant at the fair value of share-based payments." Defendants John Fieldly ("Fieldly"), the Company's Chief Executive Officer ("CEO"), and Edwin Negron-Carballo ("Negron-Carballo"), the Company's former Chief Financial Officer ("CFO"), are both certified public accountants who would have been aware of this proper accounting process.

7.      During the second and third quarters of 2021, nine directors and employees resigned or were terminated from Celsius. Celsius agreed to accelerate the vesting schedules for their share-based compensation, in accordance with the Company's 2006 Amended Stock Plan, as part of the employees' and directors' retirement or severance packages. Pursuant to ASC Topic 718, the Company was required to recognize and value the expenses associated with these accelerated shares based on the trading price on the date of termination or resignation.

8.      The accelerated vesting of the share-based compensation would have significantly reduced the Company's net income and net income per share. Therefore, Celsius improperly accounted for these former employees' and directors' share-based compensation, resulting in the reporting of inflated net income and net income per share.

9.      Due to the improper accounting, the Company's expenses were severely understated, which resulted in an overstatement of net income for the second and third quarters of 2021. For example, the Company reported net income of $3.9 million for the second quarter of

2021. However, once corrected to properly account for the share-based compensation, the net income decreased by 80% to $779,991. Consequently, the Company's net income per share also fell for the second quarter, from $0.05 per share to just $0.01 per share. The correction for the third quarter of 2021 was even more drastic, as net income dropped from the originally reported $2.7 million to an adjusted net income of negative $9.4 million.

10.     The truth began to emerge on March 1, 2022, when Celsius announced that the Company had to restate its financial statements for the second and third quarters of 2021. Specifically, the Company revealed that it had "determined that the calculation and expense of non-cash share-based compensation, related to grants of stock options and restricted stock units awarded to certain former employees and retired directors were materially understated for the three and six month periods ended June 30, 2021 and three and nine month periods ended September 30, 2021." The Company attributed the understatements to "an error of interpretation of a Class III modification rule, technical rule, which resulted in an immediate mark- to-market adjustments for the prior periods' stock grants as a non-cash expense."

11.     The Company also revealed its accounting improprieties, stating, in relevant part:

Although the Company has dedicated significant resources to the completion of finalizing its audited consolidated financial statements and related disclosures for inclusion in the Company's Annual Report on Form 10-K for the year ended December 31, 2021 and the required assessment of its internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act, the Company has encountered staffing limitations, unanticipated delays and identified material errors in previous filings as further described below. As a result, the Company has filed for the fifteen (15) day extension period provided under Rule 12b-25 and anticipates filing its Form 10-K including its audited financials prior to the expiration of the extension period. Accordingly, the fourth quarter and full year 2021 results set forth in the linked PDF are preliminary, unaudited and subject to change and adjustment.

In addition, as more fully described in the linked PDF, in connection with the preparation of its 2021, the Company determined that the calculation and expense of non-cash share-based compensation, related to grants of stock options and

restricted stock units awarded to certain former employees and retired directors were materially understated for the three and six month periods ended June 30, 2021 and three and nine month periods ended September 30, 2021 and did not comply with U.S. GAAP. In order to correct previously reported non-cash share-based compensation during these periods, the Company is recognizing additional non-cash share-based compensation expense of approximately $3,180,000 for the three month period ended June 30, 2021 and approximately $12,116,000 for the three month period ended September 30, 2021. The recognition of additional non-cash share-based compensation expense does not impact the Company's cash, revenue, other aspects of its operations or its business fundamentals.

12.     Defendant Fieldly also revealed that the Company had experienced material weakness in its internal controls during the second and third quarters of 2021 for Celsius' disclosure controls and procedures.

13.     On this news, the Company's stock price began to fall, reaching an intra-day low of $56.21 per share on March 2, 2022, a decrease of $8.79 from the $65.00 per share high on March 2, 2022. The Company's stock price continued to drop over the following days and closed at $57.60 per share on March 3, 2022, a decrease of $5.20 per share, or approximately 8.3%, from March 1, 2022.

14.     Then, on March 16, 2022, the Company filed its annual report for the fiscal year 2021 on Form 10-K with the SEC (the "2021 10-K"), which disclosed that the Company had adjusted its general and administrative expenses for the second and third quarters of the 2021 fiscal year and that, as a result, it was reporting significantly less net income for the second quarter, and a net loss in the amount of $9.4 million for the third quarter.

15.     As set forth herein, the Individual Defendants,[1] breached their fiduciary duties to the Company by personally making and/or causing Celsius to make a series of materially false and

---

[1] The Individual Defendants are Fieldly, Nicholas Castaldo ("Castaldo"), Caroline Levy ("Levy"), Hal Kravitz ("Kravitz"), Alexandre Ruberti ("Ruberti"), Cheryl Miller ("Miller"), Damon DeSantis ("DeSantis"), Joyce Russell ("Russell"), James Lee ("Lee"), and Negron-Carballo.

misleading statements about the Company's business, operations, and prospects to the public.

16.     Among other things, the Individual Defendants willfully or recklessly made and/or caused Celsius to make false and misleading statements to the investing public concerning the Company's: (i) share-based compensation expenses; (ii) net income and net income per share metrics; and (iii) the adequacy of the Company's internal controls.

17.     As a result of the foregoing, the Individual Defendant's caused the Company to disseminate materially false and misleading public statements during the Relevant Period.

18.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing Celsius to fail to correct these false and misleading statements and omissions of material fact to the investing public.

19.     In further violation of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

20.     Additionally, Defendant Fieldly breached his fiduciary duties by personally capitalizing on the Company's artificially inflated stock price and entering into a 10b5-1 trading plan in November 2021 and engaging in significant insider trading under this plan, bringing in approximately $1.5 million in rewards for himself during the Relevant Period.

21.     As a result of the foregoing, a securities fraud class action was commenced against Defendants Celsius, Fieldly, and Negron-Carballo, captioned *City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc. et al*, Case No. 9:22-cv-80418 ("S.D. Fla.") (the "Securities Class Action").  The Securities Class Action has exposed the Company to massive class-wide liability.

22.     Plaintiff did not make a litigation demand on the Board because, as detailed herein, in light of the breaches of fiduciary duties by the Individual Defendants, their collective

engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

27.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business in and maintains operations within this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this District in accordance with 28 U.S.C. §1391 because Celsius maintains its principal place of business in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### THE PARTIES

<u>Plaintiff</u>

29.     Plaintiff is, and has been continuously throughout all relevant times, the owner of Celsius common stock.

<u>Nominal Defendant</u>

30.     Nominal Defendant Celsius is a Nevada corporation and maintains its principal executive offices at 2424 N. Federal Highway, Suite 208, Boca Raton, Florida 33431.  Celsius' common stock is traded on the NASDAQ Capital Market under the ticker symbol "CELH."

<u>Individual Defendants</u>

***Director Defendants***

31.     Defendant Fieldly has served as Chairman of the Board since August 2020, as the Company's CEO since April 2018, and as a member of the Board since March 2017. According to the Company's public filings, Fieldly received $12,214,089 in compensation from the Company in 2021, and $3,577,227 in 2022. As of April 3, 2023, Fieldly owned 1,279,472 shares of Celsius common stock, representing 1.7% of the Company's total outstanding shares

32.     Defendant Castaldo has served as a member of the Board since March 2013. Castaldo also serves as a member of the Board's Human Resource and Compensation Committee

and the Governance and Nominating Committee. According to the Company's public filings, Castaldo received $184,054 in compensation from the Company in 2022.

33.     Defendant Levy has served as a member of the Board since July 2020. Levy also serves as a member of the Board's Audit and Enterprise Risk Committee and Governance and Nominating Committee. According to the Company's public filings, Levy received $184,054 in compensation from the Company in 2022.

34.     Defendant Kravitz has served as a member of the Board since April 2016 and currently serves as the Board's Independent Lead Director. Kravitz also serves as a member of the Board's Human Resource and Compensation Committee. According to the Company's public filings, Kravitz received $204,054 in compensation from the Company in 2022.

35.     Defendant Ruberti has served as a member of the Board since February 2021. Ruberti also serves as a member of the Board's Human Resource and Compensation Committee. According to the Company's public filings, Ruberti received $184,054 in compensation from the Company in 2022.

36.     Defendant Miller has served as a member of the Board since August 2021. Miller also serves as Chair of the Board's Audit and Enterprise Risk Committee and a member of the Governance and Nominating Committee. According to the Company's public filings, Miller received $186,054 in compensation from the Company in 2022.

37.     Defendant DeSantis has served as a member of the Board since August 2021. DeSantis also serves as Chair of the Board's Governance and Nominating Committee. According to the Company's public filings, DeSantis received $186,054 in compensation from the Company in 2022.

38.     Defendant Russell has served as a member of the Board since August 2021. Russell

also serves as Chair of the Board's Human Resource and Compensation Committee and as a member of the Audit and Enterprise Risk Committee. According to the Company's public filings, Russell received $186,054 in compensation from the Company in 2022.

39.     Defendant Lee has served as a member of the Board since August 2022. Lee also serves as a member of the Board's Audit and Enterprise Risk Committee and the Governance and Nominating Committee.

*Officer Defendant*

40.     Defendant Negron-Carballo served as the Company's CFO from July 2018 until April 2022. According to the Company's public filings, Negron-Carballo received $2,676,340 in compensation from the Company in 2021, and $1,697,538 in 2022.

41.     The Defendants identified in ¶¶ 31 through 40 are herein referred to as the "Individual Defendants," and collectively with Celsius, "Defendants."

### DEFENDANTS' FIDUCIARY DUTIES

42.     By reason of their positions as officers, directors, and/or fiduciaries of Celsius, and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed Celsius and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Celsius in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Celsius and its shareholders so as to benefit all shareholders equally. Each director and officer of the Company owes to Celsius and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Celsius, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Celsius, each of the Individual Defendants had knowledge of material non-public information regarding the Company. To discharge their duties, the officers and directors of Celsius were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to Celsius and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a

duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

46.     To discharge their duties, the officers and directors of Celsius were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of Celsius.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)     Ensure that the Celsisus was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to the Company's own Code of Ethical Conduct (the "Code of Conduct");

(c)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Celsius and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(d)     Remain informed as to how Celsius conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

Company was required by law to disseminate;

        (f)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

        (g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above; and

        (h)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Celsius' operations would comply with all applicable laws and Celsius' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

        47.     Each of the Individual Defendants further owed to Celsius and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of Celsius and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

        48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Celsius and were at all times acting within the course and scope of such agency.

        49.     Because of their advisory, executive, managerial, and directorial positions with Celsius, each of the Individual Defendants had access to adverse, non-public information about the Company.

        50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Celsius.

## THE COMPANY'S CODE OF ETHICAL CONDUCT

51.     The Company maintains a Code of Conduct, which applies to all officers, directors, and employees of the Company.

52.     In a section discussing employees' adherence to applicable laws and regulations, the Code of Conduct states, among other things:

> Celsius strives to comply with all laws and regulations that are applicable to its business worldwide. Though customs vary country by country and standards may vary by business environment, Celsius emphasizes good faith efforts to follow the spirit and intent of the law. Good business results do not justify a violation of business ethics, the law, or regulations. Ethical business behavior should exist at a level well above what the law requires. Celsius' reputation for integrity is one of its most valued assets, and integrity is expected of everyone.

53.     In the section titled "Insider Trading," the Code of Conduct states:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose, except the conduct of the Company's business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal. If a question arises, the employee should consult the Company's Chief Financial Officer.

54.     In the section titled "Accuracy of Books and Records," the Code of Conduct provides:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. Many employees regularly use business expense accounts, which must be documented and recorded accurately. If an employee is not sure whether a certain expense is legitimate, the employee should ask his or her supervisor or the Company's CFO. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained.

## THE COMPANY'S AUDIT AND ENTERPRISE RISK COMMITTEE CHARTER

55.     According to the Company's public filings, the Board's Audit and Enterprise Risk Committee is responsible for "the oversight of the integrity of Celsius' financial reporting process and systems of internal controls (including the integrity of Celsius' financial statements and related disclosures), Celsius' compliance with legal and regulatory requirements, the independence, qualifications and performance of the Company's independent auditors, and the Company's internal audit activities."

56.     As set forth in the proxy statement filed by Celsius with the SEC on May 1, 2023 (the "2023 Proxy") the Audit and Enterprise Risk Committee shall, among other things:

- have sole responsibility for the appointment, compensation, retention, evaluation, termination and oversight of the work of any independent auditor engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for our Company (subject, if appropriate to ratification by a vote of the stockholders of the Company);

- review and pre-approve all the audit services to be performed and the proposed fees in connection with such audit services;

- review with management, the independent auditors and the internal auditors the quality and adequacy of internal controls that could significantly affect the Company's financial statements and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations;

- review with the independent auditors the Company's relationships and transactions with related parties that are significant to the Company;

- discuss with management and the independent auditors the quality and adequacy of the Company's internal controls and disclosure controls and procedures, and review disclosures made by the Company's principal executive officer and principal financial officer in the Company's periodic reports filed with the SEC regarding compliance with their certification obligations;

- discuss the annual audited financial statements and the quarterly unaudited financial statements with management and the independent auditor prior to their filing with the SEC in our annual report on Form 10-K and quarterly reports on Form 10-Q;

- review and discuss with management and the independent auditors the Company's quarterly earnings press releases, as well as financial information and earnings guidance to be provided to investors, analysts or rating agencies;

- review with the Company's financial management the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, that may have a

material impact on the Company's financial statements;

- discuss with management and the independent auditors matters related to (a) the Company's major financial risk exposures, including financial, operational, compliance, strategic, privacy, cybersecurity, business continuity, third party risks, legal and regulatory risks, any emerging risks, (b) the Company's policies with respect to risk assessment and risk management, and (c) the steps management has taken to monitor and control these exposures;

- review with the Company's General Counsel legal and regulatory matters that may have a material impact on the financial statements, including legal cases against or regulatory investigations of the Company, and any material reports or inquiries received from regulators or government agencies;

- periodically review the Company's material policies and procedures regarding ethics and compliance, including the Company's Code of Ethical Conduct and the Company's Code of Ethics for Senior Financial Officers;

- maintain open, continuing and direct communication between the Board of Directors, the Audit and Enterprise Risk Committee and our independent auditors; and

- annually review and reassess the adequacy of, and compliance with, the Committee's charter, and recommend any proposed changes to the Board for approval.

57.     Defendants Levy, Miller, Russell, and Lee serve as members of the Board's Audit and Enterprise Risk Committee (the "Audit Defendants").

## SUBSTANTIVE ALLEGATIONS

### Background

58.     Celsius develops, markets, and sells functional drinks and liquid supplements. Its core offerings include pre- and post-workout functional energy drinks and protein bars.

59.     Prior to the Relevant Period, the Individual Defendants touted the financial success and growth of Celsius. For instance, on May 13, 2021, Celsius held its earnings call for the first quarter of 2021. During the earnings call, Defendant Fieldly stated, among other things, that Celsius "achieved a record first quarter exceeding $50 million in sales, which were derived by over 100% growth in North America sales from continued strong demand for our portfolio, and a 25% growth in international sales." This $50 million in sales revenue was an increase from the

$28 million in revenues it had achieved in the same quarter of 2020.

60.     The Company's net income, however, failed to grow in kind and remained a key focus of investors and analysts. Indeed, on May 21, 2021, Defendant Fieldly held an interview with Yahoo Finance where an analyst voiced concerns about the Company's increasing expenses and the effect the increase had on the Company's margins. The analyst questioned whether the Company would be able to obtain enough cans for its products, given the aluminum can shortage in the industry, and whether the Company had raised its prices in light of this. Defendant Fieldly responded, stating, "[w]e have been affected. There is a can shortage. There's a can pandemic out there right now, especially in the beverage industry. We're importing cans from around the world. We started, actually, this process back in Q4, a little bit ahead of the curve. We started importing cans back in March. So our margins were impacted."

61.     At the start of the Relevant Period, on August 12, 2021, the Company announced its financial results for the second quarter of 2021. The Company reported remarkable revenue growth for the second quarter of 2021, increasing to $65 million from $30 million in the same quarter the year prior. Additionally, the Company reported an increase in net income to $3.96 million in 2021, up from $1.2 million for the same quarter of 2020.

62.     Then, on November 11, 2021, the Company reported its third quarter 2021 financial results, announcing that revenue had increased to $94.9 million, compared to $36.5 million in the third quarter of 2020. However, the Company also disclosed that its net income fell, dropping to $2.75 million in 2021 from $4.75 million in the same quarter of 2020. The Company chalked the decrease up to the increased cost of aluminum cans and supply chain issues.

63.     Rather than address the issues with its net income, the Company chose to use improper accounting methods to give the appearance of net income growth. This was done

primarily through the accounting methods the Company used for its share-based compensation plans.

64.     The Company has a history of compensating its employees at all levels and directors with noncash share-based compensation because "management deems it very important to motivate employees by providing them ownership in the business in order to promote their overall performance which translates into the continued success of our business based on key performance attributes."

65.     The Company's share-based compensation policies were dictated by its 2006 Incentive Stock Plan, which the Company adopted on January 18, 2007. The 2006 Incentive Stock Plan provided, in relevant part:

> Equity incentives may be in the form of stock options with an exercise price not less than the fair market value of the underlying shares as determined pursuant to the Amended 2006 Incentive Stock Plan, stock appreciation rights, restricted stock awards, stock bonus awards, other stock-based awards, or any combination of the foregoing. The Amended 2006 Incentive Stock Plan is administered by our Human Resource and Compensation Committee. Options to purchase 245,000 shares of common stock are outstanding under the 2006 Amended 2006 Incentive Stock Plan as of the date of this Report. The Amended 2006 Incentive Stock Plan (but not awards thereunder) expired in January 2017.

66.     On April 30, 2015, Celsius adopted a new policy to dictate its share-based compensation (the "2015 Stock Incentive Plan"). The 2015 Stock Incentive Plan stated, in relevant part:

> The 2015 Plan permits the grant of options and shares for up to 5,000,000 shares. In addition, there is a provision for an annual increase of 15% to the shares included under the plan, with the shares to be added on the first day of each calendar year, beginning on January 1, 2016.

67.     The Company filed its annual proxy statement filed on July 2, 2021 with the SEC (the "2021 Proxy"), which stated that there were 7,041,493 shares of common stock reserved for issuance under the 2015 Stock Incentive Plan. The 2021 Proxy went on to state, in relevant part:

The number of shares so reserved automatically adjusts upward on January 1 of each year, so that the number of shares covered by the 2015 Incentive Stock Plan is equal to 15% of our then issued and outstanding common stock. Stock option and awards to purchase an aggregate of 5,019,646 shares of our common stock are outstanding under the 2015 Incentive Stock Plan as of the date of this Report.

68.     The Company's stock incentive plans are administered by the Board's Human Resource and Compensation Committee, which is presently comprised of Defendants Russell, Kravitz, Castaldo, and Ruberti.

69.     The Company was required to follow specific accounting rules for their stock incentive plans. Specifically, the Company was required to follow ASC Topic 718, which provides corporations guidance on how to properly expense employee share-based compensation on a corporate income statement. Specifically, ASC Topic 718 requires the Company to account for the fair value of employee awards as a compensation expense in the financial statements. When the Company first implemented the 2006 Stock Incentive Plan, it abided by ASC Topic 718.

70.     Indeed, consistent with ASC Topic 718, the Company measures share-based compensation costs "on the date of grant at the fair value of the share-based payments." In other words, stock option compensation expenses were to be calculated and recognized on a company's income statement using the fair market value of the stock as of the date of termination or retirement of an employee.

71.     In addition to share-based compensation, the Company's employees and directors are also compensated with the issuance of restricted stock units ("RSUs"), which, according to the Company's public filings, "give the holder the right to receive one share of common stock for each restricted stock unit upon meeting service-based vesting conditions. . . ."

72.     Stock options and restricted stock units awarded to employees and directors are forms of share-based compensation that the Company recognizes as a "non-cash expense" on its

income statements. Celsius classifies this non-cash share-based compensation as "general and administrative expenses" ("G&A") on its income statements.

73.     In 2021, nine employees and directors of the Company retired or were terminated, each of whom had participated in the share-based compensation program and had unvested RSUs. Pursuant to Board resolutions or severance agreements, the Company was required to accelerate the vesting conditions for the share-based compensation and restricted stock units, which they did after the directors and employees left the Company. The Company called this practice of accelerating the vesting "Type III modification," which requires a re-valuing of the unvested awards at their fair market value as of the date of modification, pursuant to ASC Topic 718.

74.     The Company's share-based compensation awards were "modified" when the terminated employees' stock-based compensation vesting schedules were accelerated. To account for the expenses associated with this "modification," accountants typically look to ASC Topic 718-20-55-108, which states:

> [I]f at the date of modification awards are not expected to vest under the original vesting conditions, an entity should recognize compensation cost only if the awards vest under the modified vesting conditions. Said differently, if the entity believes that the original performance or service vesting condition is not probable of achievement at the date of the modification, the cumulative compensation cost related to the modified award, assuming vesting occurs under the modified performance or service vesting condition, is the modified award's fair value at the date of the modification

75.     When the Company accelerated the vesting conditions of these awards, it was supposed to value the restricted stock units at the then-current fair market value of the Company's stock and recognize share-based compensation expenses in the second and third quarters of 2021 accordingly. But, by the second quarter of 2021, the Company's stock price was increasing and hit a high of $81.00 per share in June 2021. Despite the requirements the Company had to follow, Defendants Fieldly and Negron-Carballo made alternative plans because they knew that properly

valuing the share-based compensation expenses in accordance with ASC Topic 718 meant that G&A expenses for the second and third quarter would substantially increase and result in a net loss.

76.      Defendant Negron-Carballo characterized the modification as a "type III" error in interpretation. ASC Topic 718 defines Type III as an "improbable to probable modification," meaning that the "original performance or service vesting condition" was "not probable of achievement at the date of modification," but the modified performance, *i.e.*, no future service at all, was "probable of achievement at the date of modification." The modification in the awards transformed the service conditions from "improbable" to "probable." Thus, the Company should have recognized costs associated with the accelerated vested stock-based compensation when it accelerated the vesting schedule.

77.      As a result, the Company's G&A expenses for the second and third quarters of 2021 were substantially undervalued at $9.12 million and $11.14 million, respectively. In turn, the Individual Defendants were able to report a positive net income for the second and third quarters, when in reality, cumulative income for those two quarters on a year-to-date basis actually was a net loss of $8.01 million. Specifically, Celsius overstated net income as $4 million, or net income per share as $0.05 for the second quarter of 2021; and Celsius overstated net income as $2.75 million, or net income per share as $0.04 for the third quarter of 2021.

78.      The Individual Defendants would make materially false and misleading statements throughout the Relevant Period regarding their finances and accounting principles to maintain this appearance of financial growth.

<u>The False and Misleading Statements</u>

79.      During the second and third quarters of 2021, the Company materially understated

21

its G&A expenses and its total operating expenses. As a result, the Company materially overstated its net income and its net income per share for those quarters. These false statements appeared in the Company's Form 8-Ks filed on August 12, 2021 and November 11, 2021, as well as its Form 10-Qs filed on those same dates. Defendants Fieldly and Negron-Carballo signed these public filings, certifying their accuracy, despite the fact that they contained false metrics. Defendants Fieldly and Negron-Carballo repeated these false metrics during analyst calls and other investor presentations throughout the Relevant Period.

80.     On August 12, 2021, Celsius released its financial results for the second quarter of 2021 in a Form 8-K. The Company reported net income of $3.9 million and net income per share of $0.05 for the second quarter of 2021. These statements were materially false and misleading because once the Company properly accounted for its share-based compensation expenses, net income for the second quarter of 2021 was actually just $779,991, or $0.01 per share.

81.     The Company also filed its quarterly report for the second quarter ended June 30, 2021 on From 10-Q with the SEC on August 12, 2021 (the "2Q 2021 10-Q"). The 2Q 2021 10-Q stated the following false metrics:

   a.  Net income was reported as $3.9 million, but when its share-based compensation was properly accounted for, this figure dropped to $779,991.

   b.  Net income per share was reported as $0.05, but when its share-based compensation was properly accounted for, this figure dropped to $0.01.

   c.  General and administrative expenses were reported as $9.1 million, but when its share-based compensation was properly accounted for, this figure rose to $12.3 million.

   d.  Total operating expenses were reported as $24.7 million, but when its share-

based compensation was properly accounted for, this figure rose to $27.8 million.

82.     The 2Q 2021 10-Q also included false metrics for the six- month period ended June 30, 2021, as follows:

    a.  Net income was reported as $4.5 million, but when its share-based compensation was properly accounted for, this figure dropped to $1.4 million.

    b.  Net income per share was reported as $0.06, but when its share-based compensation was properly accounted for, this figure dropped to $0.02.

    c.  General and administrative expenses were reported as $16.9 million, but when its share-based compensation was properly accounted for, this figure rose to $20.1 million.

    d.  Total operating expenses were reported as $44.4 million, but when its share-based compensation was properly accounted for, this figure rose to $47.6 million

83.     Additionally, the Company held an earnings call for the second quarter of 2021 on August 12, 2021. During the earnings call, Defendant Negron-Carballo reported the false metrics to investors and analysts, stating, in relevant part:

> General and administrative expenses for the three months ended June 30, 2021 were $9.1 million, an increase of $5.2 million or 133% from $3.9 million for the three months ended June 30, 2020. This increase was primarily attributable to stock option expense, which amounted to $4 million for the three months ended June 30, 2021, or an increase of $2.8 million, which accounts for 51.9% of the total increase in this area when compared to the prior year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote overperformance. Additionally employee cost for the three months ended June 30, 2021 reflect an increase of $670,000 or 61%, as investments in this area are also required to properly support our higher business volume and

the commercial and operational areas of the business. Additionally, travel and other similar expenses are now being incurred.

84.     Defendant Negron-Carballo went on to state, "as a result of the above [metrics], the net income for the three months ended June 30, 2021 was $3.9 million or $0.05 per share on a weighted average of 73.2 million shares outstanding and dilutive earnings of $0.05 per share based on a fully diluted weighted average of 77.2 million shares outstanding."

85.     These statements by Defendant Negron-Carballo were materially false and misleading. Indeed, when Celsius accounted for expenses associated with its share-based compensation properly, G&A expenses for the three months ended June 30, 2021 were $12.3 million, not $9.1 million. Similarly, when Celsius accounted for expenses associated with its share-based compensation properly, its stock option expenses were actually $7.18 million for the three months ended June 30, 2021 (and not $4 million, as reported), which was an increase of $5.98 million (and not $2.8 million, as reported). When Celsius accounted for expenses associated with its share-based compensation properly, net income for the three months ended June 30, 2021 was actually $779,991, not $3.9 million, and net income per share was actually $0.01, not $0.05.

86.     The 2Q 2021 10-Q reported that the Company recognized $4 million and of non-cash compensation for the six-months ended June 30, 2021. However, in reality, the Company's non-cash compensation for this period was actually $7.18 million, meaning it was understated by $3.18 million.

87.     On August 19, 2021, the Company held its annual shareholder meeting, where Defendant Fieldly touted the Company's profitability, stating, in relevant part:

> In addition, we continue to deliver gross profits of $48.8 million, up 88%. Margins as we indicated were impacted due to COVID constraints of importing of cans, raw materials. We've [sic] also have set a path forward as we continue to grow and scale as we continue to improve our gross profits. In addition, we delivered net income of $4.5 million and adjusted EBITDA through the period of 12.9, which is 139%

increase.

88.     At the same shareholder meeting Defendant Negron-Carballo stated:

In terms of financial snapshot or some of the highlights, obviously in Q1, $65.1 million of revenue, company record and then the break out between the different regions as well. And obviously here, you can see in the U.S. with a 100 – almost a 160% growth, which from my standpoint is stellar. We had some pretty good solid growth as well, international 25% mainly through Europe. Again, you see the good gross profit profile that we're having. And then when you look at EBITDA for the quarter basically at $8 million, that translates to about 12% of revenue which is a fairly respectable. And that's despite the fact that we had to book a couple of charges there to make sure that we have good reserves in terms of the fact that we server. And then, obviously, that translates to about $4 million of net income or 4.5 for the year.

89.     However, these statements were materially false and misleading. Indeed, when the Company properly accounted for the expenses of the share-based compensation program, net income for the six months ended June 30, 2021 was $1.37 million, not $4.5 million.

90.     Management also made a presentation during the 2021 shareholder meeting which contained similar false metrics. The presentation included the same statistic for net income for the six months ended June 30, 2021 and for the second quarter of 2021, stating that net income had been $4.5 million and $4 million, respectively. However, these statements were materially false and misleading because, as detailed above, in reality, the net income was actually $1.37 million and $779,991, respectively.

91.     On November 11, 2021, Celsius released its results for the third quarter of 2021 in a Form 8-K filed with the SEC. The Company reported net income of $2.7 million for the third quarter of 2021 and net income per share of $0.04. These statements were materially false and misleading. In fact, when Celsius accounted for its share-based compensation expenses properly, net income for the third quarter of 2021 was actually a net loss of $9.4 million and net income per share was actually negative $0.13.

92.     Also on November 11, 2021, Celsius filed its quarterly report for the third quarter ended September 30, 2021 with the SEC (the "3Q 2021 10-Q"). The 3Q 2021 10-Q included the following false metrics:

  a.  Net income was reported as $2.7 million, but when its share-based compensation was properly accounted for, this figure dropped to a net loss of $9.4 million.

  b.  Net income per share was reported as $0.04, but when its share-based compensation was properly accounted for, this figure dropped to negative $0.13.

  c.  General and administrative expenses were reported as $11.1 million, but when its share-based compensation was properly accounted for, this figure rose to $23.3 million.

  d.  Total operating expenses were reported as $33.8 million, but when its share-based compensation was properly accounted for, this figure rose to $45.9 million.

93.     The 3Q 2021 10-Q also included false metrics for the nine-month period ended September 30, 2021, including:

  a.  Net income was reported as $7.3 million, but when its share-based compensation was properly accounted for, this figure dropped to a net loss of $8.01 million.

  b.  Net income per share was reported as $0.10, but when its share-based compensation was properly accounted for, this figure dropped to negative $0.11.

26

c.  General and administrative expenses were reported as $28.07 million, but when its share-based compensation was properly accounted for, this figure rose to $43.4 million.

d.  Total operating expenses were reported as $78.2 million, but when its share-based compensation was properly accounted for, this figure rose to $93.5 million.

94.    The 3Q 2021 10-Q further provided, in relevant part: "for the nine months ended September 30, 2021 and 2020, the Company recognized approximately $13.4 million and $4.7 million, respectively, of non-cash compensation expense (included in general and administrative expense in the accompanying consolidated statements of operations and comprehensive income). . . ." However, this statement was materially false and misleading because, in fact, non-cash compensation expenses for the nine months ended September 30, 2021 was actually $15.3 million when the Company properly accounted for its share-based compensation expenses.

95.    The Company also announced its third quarter 2021 financial results on November 11, 2021 during an earnings call. During the earnings call to investors and analysts, Defendant Fieldly touted the Company's financials, stating, in relevant part:

96.    Defendant Negron-Caballo also made representations about the Company's financials during the earnings call, stating:

> General and administrative expenses for the three months ended September 30, 2021 were $11.1 million, an increase of $6.4 million or 134% from $4.8 million for the three months ended September 30, 2020. This increase was mainly related to stock option expense, which amounted to $5.8 million for the three months ended September 30, 2021, an increase of $3.7 million, which accounts for 50% of the total increase in this area when compared to the prior-year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote their overperformance.
>
> Administrative expenses amounted to $2.6 million or an increase of $1.3 million or

27

97% when compared to the prior-year quarter. This variance is mainly related to an increase in bad debt reserve of $200,000. And increases in audit costs, legal expenses, insurance costs and office rent account for the majority of the remaining fluctuation of $1.1 million. Depreciation and amortization increased by $200,000 when compared to the prior-year quarter.

Lastly, all other administrative expenses, which were mainly composed of research, development and quality control testing increased by $235,000 when compared to the second quarter of 2020. As a percentage of revenue, general and administrative expenses were 11.7% in the third quarter of 2021, when compared to 12.9% for the prior-year quarter. If we then exclude the non-operational stock option expense, general and administrative expenses for the 2021 quarter would amount to only 6% of revenues.

97.     The statements made by Defendants Fieldly and Negron-Caballo on November 11, 2021 were materially false and misleading. In reality, when the Company properly accounted for its share-based compensation expenses, net income for the third quarter of 2021 was actually a net loss of $9.4 million, or $0.13 per share. Additionally, the Company's G&A expenses for the three months ended September 30, 2021 were actually $23.3 million, not $11.1 million.

98.     In addition to the materially false and misleading statements the Individual Defendants made regarding the Company's financials, the Individual Defendants also made false statements to investors regarding the adequacy of the Company's disclosure controls and procedures.

99.     Indeed, the 2Q 2021 10-Q stated, in relevant part:

Our President and Chief Executive Officer and our Chief Financial Officer have concluded that as of June 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors.

100.    The 3Q 2021 10-Q made similar representations about the Company's disclosure controls and disclosures. The 3Q 2021 10-Q stated that Defendants Fieldly and Negron-Carballo

"conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures . . . to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported." Additionally, the 3Q 2021 10-Q stated that the Company:

> Concluded that as of September 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors. . . .

101.     The statements in the 2Q 2021 10-Q and the 3Q 2021 10-Q were materially false and misleading because, as would later be revealed in an 8-K filed on March 1, 2022 (the "March 2022 8-K"), "the Company's previously issued unaudited consolidated financial statements for the period ended June 30, 2021 and September 30, 2021, should no longer be relied upon and are to be restated in order to reflect the appropriate accounting for the share based compensation awards modifications." The March 2022 8-K further added, "as a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting."

## The Truth Emerges

102.     The truth began to emerge on March 1, 2022, after the market closed, when the Company disclosed that it could not timely file it 2021 annual report due to "staffing limitations, unanticipated delays and identified material errors in previous filings." Specifically, the Company "determined that the calculation and expense of noncash share-based compensation, related to grants of stock options and restricted stock units awarded to certain former employees and retired directors were materially understated for the three- and six-month periods ended June 30, 2021

and three- and nine-month periods ended September 30, 2021." As a result, management concluded that there was a material weakness in the Company's internal controls over financial reporting.

103.    On March 1, 2022, in the March 2022 8-K, the Company announced that it would restate its previously issued financial statements for the periods ended June 30, 2021 and September 30, 2021. Specifically, the Company stated:

> In connection with the preparation of its consolidated financial statements for the year ended December 31, 2021, the Company determined that the calculation of expense of non-cash share based compensation related to grants of stock options and restricted units ("RSUs") issued to former employees and retired directors was materially understated during the three-and six-month periods ended June 30, 2021 and three- and nine-month periods ended September 30, 2021 (the "Affected Periods"), based on the application of U.S. generally accepted accounting principles. During the Affected Periods, the stock options and RSUs were modified and the expense should have been calculated and recognized using the fair market value of the awards as of the date of modification and recognized over the remaining service period.

104.    The Company expected to record share-based compensation expense of $3.18 million for second quarter of 2021 and of $12.116 million for the third quarter of 2021, resulting in resulting in net income of $779,991 and a net loss of $9.4 million, respectively.

105.    Celsius also hosted a call with analysts and investors on March 1, 2022 to discuss the Company's earnings for the fourth quarter 2021 (the "4Q 2021 Earnings Call"), during which Defendant Fieldly stated:

> In addition, we have had multiple open positions, and we have been vigorously recruiting top talent into the company's finance area to support our operations and our strong growth in our business, which was impacted by our ability to finalize the Ernst & Young first full year audit. We filed for an extension on our Form 10-K with the SEC earlier this evening and expect to file our 10-K during the 15 calendar day extension period as of the final audit and internal control procedure work are performed and completed.
>
> We have been able to finalize the majority of the pending items prior to our call today, including as reported today in an 8-K filing, and a prior period error correction has been made to the noncash stock expense in our second and third

quarter financial results for 2021 totaling approximately $2.7 million and $12.6 million in additional noncash stock expense for those periods, which was the results of prior stock grants that were awarded to foundational individuals, which were modified to allow for continual vesting past their contracted service dates.

This was an error of interpretation of a Class III modification rule, technical rule, which resulted in an immediate mark-to-market adjustments for the prior periods' stock grants as a non-cash expense. We highlighted this financial impact in our full year updated totals on our flash results table at the beginning of our earnings supplement as well as the financial statements on the earnings supplement included in the 8-K filing today, which outlines the prior period of changes reflected in the non-cash stock expense for those periods.

In addition, in light of this error, our management has then concluded that a material weakness existed in the Company's internal controls of our financial reporting for the Company's disclosure controls and procedures, which were not effected as of December 31, 2021, which was disclosed in our 8-K filing earlier today and which will be further discussed in our upcoming filing.

106.    Defendant Negron-Carballo also made representations during the 4Q 2021 Earnings Call, stating, in relevant part:

I wanted to start by providing additional clarity on the adjustments that John highlighted regarding the noncash stock compensation expense. During Q2 and Q3, the company calculated and recognized non-cash stock-based compensation expense related to options and RSUs held by former foundational employees and retired directors ratably over their vesting period. However, because the options and the RSUs were allowed to continue to pass after the employees separated and the directors retired from the company, those awards were deemed to have been modified. And the expense should have been calculated and recognized using the firm market value of the stock as of the date of termination or retirement.

This led to the adjustments that John discussed, which resulted in the understatement of the stock compensation expense in Q2 in the amount of $3.1 million and $12.1 million for Q3. These aspects are further detailed in the 8-K that we filed today.

As a result of this situation, the company's management and the Audit Committee of its Board of Directors have determined that the company's previously issued interim unaudited financial statements contained in the company's quarterly reports on Form 10-Q for each of the affected quarters should no longer be relied upon. The company's management has also concluded that in light of this situation, as previously described, a material weakness existed in the company's internal control over the proper valuation of stock compensation expense regarding the modifications performed to stock awards for some former employees and retired directors.

107.    Also during the same 4Q 2021 Earnings Call, an analyst for Stifel, Nicolaus & Co. asked Defendant Negron-Carballo whether an ongoing SEC investigation, which was first disclosed by the Company on September 30, 2021, was related to the Company's failure to properly report employee share-based compensation. Defendant Negron-Carballo responded: "I'm not sure as it relates to that, not necessarily. It's more of a situation that happened regarding some of the awards that had to be properly valued at fair market value for some of these employees that were separated and some of the Board members that also retired." Defendant Fieldly then added:

> And I'll just chime in, in regards to some of the employees, it was also – it's a technical aspect there because some of them are still providing services through contractual services. So there was just a technicality. That was an error in interpretation there on those stock awards. So it was definitely an oversight and a correction that was noted.

108.    It was later revealed in an amendment to its most recent annual report filed on Form 10-K/A with the SEC on April 19, 2023, that the timeline and results of the SEC investigation are currently unknown. To date, the Company has not disclosed the nature of the SEC's investigation nor the potential violations.

109.    Finally, the Company formally restated its financial statements on March 16, 2022 on page F-26 of its annual report on Form 10-K filed with the SEC (the "2021 10-K"). The Company stated, in relevant part:

> Subsequent to filing the Company's Quarterly Reports on Form 10-Q for the periods ended June 30, 2021 and September 30, 2021, the Company determined that certain amounts reported in the Company's previously issued unaudited consolidated statements of operations and comprehensive income (loss) and consolidated balance sheets contained misstatements. . . . In accordance with Staff Accounting Bulletin No. 99, Materiality, management evaluated the materiality of the misstatements from a qualitative and quantitative perspective and concluded that the misstatements were material to the three-and six-months ended June 30, 2021 and the three- and nine-months ended September 30, 2021, respectively.

110.    The 2021 10-K further explained:

There were certain Board of Directors members and employees whose service was

terminated during the year. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-evaluation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021.

111.    The Company then restated its consolidated financial statements for three- and six-months ended June 30, 2021, and three- and nine- months ended September 30, 2021 as follows: net income for the second quarter of 2021 was actually $779,991, not $3.96 million, as initially reported; and net income for the third quarter of 2021 was actually negative net income of $9.4 million, not $2.75 million as initially reported.

112.    The Company further disclosed that:

There were certain Board of Directors members and employees whose service was terminated during the year. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-valuation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021. See Note 2 and Unaudited Supplementary Information for the impact of these modifications on the previously reported unaudited 2021 quarterly consolidated statements of operations and comprehensive income (loss) for the periods ending June 30, 2021 and September 30, 2021.

113.    Then, on May 10, 2022, in a quarterly report filed with the SEC on Form 10-Q, the Company disclosed that the material weaknesses identified in its internal controls were not yet remedied as of March 31, 2022. Specifically, the Company reported:

Management failed to design effective controls related to the application of U.S. GAAP guidance in their evaluation of modifications to share-based payment arrangements, resulting in the correction of errors in previously issued interim financial statements relating to the recognition of compensation expense described above;

For a substantial portion of the year, management did not design and maintain effective controls over information technology general controls (ITGCs) for information systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, management did not design and maintain: sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; program change management controls to ensure that information technology (IT) program and data changes affecting financial information technology applications and underlying accounting records are authorized, tested, and implemented appropriately. As a result, business process controls (automated and it-dependent manual controls) that are dependent on the ineffective ITGCs, or that use data produced from systems impacted by the ineffective ITGCs were deemed ineffective at December 31 2021; and

Management did not have an adequate process in place to monitor and provide oversight over the completion of its testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner. As such, we determined that management failed to fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient and timely management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient personnel to timely support the Company's internal control objectives; (iii) performing timely monitoring and oversight to ascertain whether the components of internal control are present and functioning effectively.

## DAMAGE TO CELSIUS

114. As a direct and proximate result of the Individual Defendants' misconduct outlined herein, the Company has lost, and will continue to lose, millions of dollars.

115. These costs include, *inter alia*:

   a. legal fees in connection with the Securities Class Action, including attorneys', accountants', experts', and investigators' fees;

   b. costs to implement measures to remedy the material weaknesses in the Company's internal controls over financial reporting; and

   c. substantial compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

116.    On August 5, 2022, defendants in the Securities Class Action moved to dismiss the amended complaint (ECF No. 47). On February 13, 2023, United States Magistrate Judge Bruce E. Reinhart entered a Report and Recommendation that the motion to dismiss be granted as to Defendant Fieldly and denied as to Defendant Negron-Carballo and the Company (ECF No. 55). On March 22, 2023, United States District Judge Donald M. Middlebrooks entered an order adopting Judge Reinhart's findings and conclusions (ECF No. 62).

117.    Consequently, the Company continues to face substantial liability in the Securities Class Action.

118.    As a direct and proximate result of the Individual Defendants' misconduct and breach of fiduciary duties, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a liar's discount regarding the Company's stock in the future.

119.    Additionally, during the Relevant Period, Defendant Fieldly financially benefitted from the inflated stock price. Indeed, Defendant Fieldly sold a substantial amount of Celsius common stock pursuant to a trading plan he entered into during the Relevant Period. Specifically, on November 30, 2021, four months into the Relevant Period, Defendant Fieldly executed a 10b5-1 trading plan. 10b5-1 plans are used by insiders as affirmative defenses against allegations that they traded company stock while in possession of material non-public information. The timing of Fieldly's 10b5-1 plan initiation, nine years after he joined the Company and four months into the Relevant Period, is highly suspicious. Immediately following execution of the 10b5-1 plan, Fieldly sold 20,000 shares of Celsius common stock pursuant to the plan on December 27, 2021, for gross proceeds of $1.5 million.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

120.     Plaintiff brings this action derivatively in the right and for the benefit of Celsius to redress injuries suffered, and to be suffered, by Celsius as a direct result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof by the Individual Defendants.

121.     Celsius is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

122.     Plaintiff is a current shareholder of Celsius and has owned Celsius common stock at all times during the time of the wrongful course of conduct constituting the basis for the claims asserted herein.

123.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

124.     A pre-suit demand on the Board of Celsius is futile and, therefore, excused. At the time this action was commenced, the nine-member Board was comprised of Individual Defendants Fieldly, Castaldo, Levy, Kravitz, Ruberti, Miller, DeSantis, Russell, and Lee.

125.     Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.  As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the current directors of Celsius are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

126.    The Individual Defendants either knew or should have known of the false and misleading statements that were made on the Company's behalf. However, the Individual Defendants took no steps in a good faith effort to prevent or remedy that situation.

127.    Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties. Further, each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

128.    Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

129.    The Audit Defendants are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit and Enterprise Risk Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements.

130.    Throughout the Relevant Period, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions and the adequacy of the Company's internal controls as

alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

131.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter.

132.     As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

133.     The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

134.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Celsius. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Celsius, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

135.    If there is no directors' and officers' liability insurance, then the directors will not cause Celsius to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

136.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

137.    Thus, for all of the reasons set forth above, all of the directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange  Act and Rule 10b-5

138.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

139.    The Individual Defendants, individually and in concert, directly or indirectly, willfully, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140.    The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchases of Celsius common stock.

141.    The Individual Defendants acted with scienter because they: (a) knew that the public documents and statements issued or disseminated in the name of Celsius were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly, jointly, willfully, directly or indirectly, participated, or acquiesced, in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

142.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Celsius, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with Celsius which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

143.    As a result of the foregoing, the market price of Celsius common stock was artificially inflated during the relevant time period.  In ignorance of the falsity of the statements, a reasonable investor would attach importance to such misrepresentations in determining how to proceed.  In particular, Plaintiff considered and relied upon the Individual Defendants' statements described above and/or the integrity of the market price of Celsius common stock in purchasing Celsius common stock at prices that were artificially inflated because of these false and misleading statements. Consequently, Plaintiff suffered damages as a result.

144.    Likewise, as a result of the wrongful conduct alleged herein, the Company has also suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action

## COUNT II

### Against the Individual Defendants for
### Breach of Fiduciary Duty

145.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

146.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

147.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

148.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.    The Individual Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by

concealing the other Individual Defendants' fraudulent statements and material omissions.

150.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

151.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

152.    Plaintiff on behalf of Celsius has no adequate remedy at law.

**COUNT III**

**Against Individual Defendant Fieldly for
Breach of Fiduciary Duty**

153.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

154.    At all relevant times, Individual Defendant Fieldly held a position within the Company that provided him access to confidential, proprietary information concerning the Company's financial condition and the Company's internal controls over financial reporting. Notwithstanding his duty to refrain from trading in Celsius common stock under the circumstances, Fieldly sold his holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances.

155.    The insider sales during the Relevant Period were not originally part of any regular pattern of sales for Defendant Fieldly.

156.    The information described above was proprietary, non-public information concerning the Company's financial condition. It was a proprietary asset belonging to the Company, which Defendant Fieldly misappropriated to his own benefit when he sold Celsius stock. At the time of his sale, Fieldly was aware of the true nature of the Company's net income metrics and its share-based employee compensation expenses which, when disclosed to the market, would cause the inflated price of the Company's common stock to significantly decrease. Fieldly's sale of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

157.    Plaintiff on behalf of Celsius has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for
### Aiding and Abetting Breach of Fiduciary Duty

158.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

159.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

160.    Plaintiff on behalf of Celsius has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for
### Unjust Enrichment

161.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

162.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Celsius.

163.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Celsius that were tied to the performance or artificially inflated valuation of Celsius, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

164.    Plaintiff, as a shareholder and a representative of Celsius, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

165.    Plaintiff on behalf of Celsius has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for
### Waste of Corporate Assets

166.    Plaintiff incorporates by reference and realleges the above-referenced allegations as if fully set forth herein.

167.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

168.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

169.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

170.     Plaintiff on behalf Celsius has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief against defendants as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  July <u>12</u>, 2023                    **COOK LAW, P.A.**

                                      By:   */s/ William J. Cook*
                                             William J. Cook, Esq.
                                             Florida Bar No. 986194
                                             610 East Zack Street, Suite 505
                                             Tampa, Florida 33602
                                             Telephone: 813/489-1001
                                             Facsimile: 813/489-1008
                                             Email: wcook@cooklawfla.com


                                             **GRABAR LAW OFFICE**
                                             Joshua H. Grabar (#5906953)
                                             One Liberty Place
                                             1650 Market Street, Suite 3600
                                             Philadelphia, PA 19103
                                             Telephone: 267-507-6085
                                             Email: jgrabar@grabarlaw.com

                                             *Counsel for Plaintiff*